Matthew T. Christensen, ISB: 7213
Branden M. Huckstep, ISB: 10679
ANGSTMAN JOHNSON
199 N. Capitol Blvd., Ste 200
Boise, ID 83702
Phone: (208) 384-8588
Fax: (208) 629-1157
Email:  mtc@angstman.com
        bmh@angstman.com

Attorneys for the Plaintiff

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| AMY EVANS, an individual<br><br>        Plaintiff,<br><br>v.<br><br>JAMES HEPWORTH, an individual; MICHELA SWARTHOUT, an individual; SWARTHEP, LLC, a Wyoming limited liability company; HZ GLOBAL, LLC, a Wyoming limited liability company; LUXE IMPORTS, LLC, an Idaho limited liability company; LUXE IMPORTS, LLC, a Montana limited liability company; WANTHUB, INC., a Delaware corporation; TREASURE VALLEY POWDER COATING, LLC, an Idaho limited liability company; MCWORTH PROPERTIES, LLC, a Wyoming limited liability company; YUANCELA, LLC, a Wyoming limited liability company; CLOUD PEAK LAW GROUP, P.C., a Wyoming professional corporation; and DOES 1-10.<br><br>        Defendants. | Case No.<br><br><br>**VERIFIED COMPLAINT & DEMAND FOR JURY TRIAL** |

The Plaintiff, Amy Evans ("Evans"), alleges as follows:

## PARTIES

1.      The Plaintiff, Amy Evans, is an individual residing in Ada County, Idaho.

2.      Defendant James Hepworth ("Hepworth") is an individual whose last known place of residence was located in Ada County, Idaho.  Upon information and belief, Hepworth no longer resides at that residence.

3.      Defendant Michela Swarthout ("Swarthout") is an individual whose last known place of residence was located in Ada County, Idaho.  Upon information and belief, Swarthout no longer resides at that residence.

4.      Defendant Swarthep, LLC ("Swarthep") is a limited liability company organized in Wyoming, with a principal place of business located in Sheridan, Wyoming.

5.      Defendant HZ Global, LLC ("HZ Global") is a limited liability company organized in Wyoming, with a principal place of business located in Sheridan, Wyoming.

6.      Defendant Luxe Imports, LLC, ("Idaho Luxe") is a limited liability company organized in Idaho, with a principal place of business located in Ada County, Idaho.

7.      Defendant Luxe Imports, LLC ("Montana Luxe") is a limited liability company organized in Montana, with a principal place of business located in Ada County, Idaho.

8.      Defendant Wanthub, Inc., ("Wanthub") is a Delaware corporation with its principal place of business located in Ada County, Idaho.

9.      Defendant Treasure Valley Powder Coating, LLC, ("TV Powder Coating") is a limited liability company organized in Idaho, which appears to no longer do business.  When operational, TV Powder Coating appears to have operated in Ada County, Idaho.

10.    Defendant McWorth Properties, LLC ("McWorth") is a limited liability company organized in Wyoming, with a principal place of business located in Sheridan, Wyoming.

11.    Defendant Yuancela, LLC ("Yuancela") is a limited liability company organized in Wyoming, with a principal place of business located in Sheridan, Wyoming.

12.    Defendant Cloud Peak Law Group, P.C., ("Cloud Peak") is a professional corporation organized under the laws of Wyoming, with a principal place of business located in Sheridan, Wyoming.

13.    Upon information and belief, Hepworth and/or Swarthout are the owners, members, and/or managers of Swarthep, HZ Global, Idaho Luxe, Montana Luxe, TV Powder Coating, McWorth Properties and Yuancela.

14.    Hepworth and/or Swarthout are the only individuals with control over the bank accounts and other assets held by Swarthep, HZ Global, Idaho Luxe, Montana Luxe, TV Powder Coating, and McWorth Properties.   Swarthout controls the bank accounts and other assets held by Yuancela, along with Brandon Zehm.

15.    Defendant Does 1-10 are individuals or entities who may also have committed the harms alleged herein.  The exact identity of these parties is presently unknown.  At such time as Plaintiff becomes aware of the identities of these parties (if any), Plaintiff will amend this Complaint to name those additional parties.

## JURISDICTION AND VENUE

16.    The Court has subject matter jurisdiction over the claims arising under the laws of the United States under 28 U.S.C. §1331, and jurisdiction over all other related claims under 28 U.S.C. §1367.

17.     Venue is proper in this Court under 28 U.S.C. §1391(b)(1) or (2) and 18 U.S.C. §1965.

## FACTUAL ALLEGATIONS

### Facts applicable to all Defendants and Claims

18.     The Plaintiff, Amy Evans ("Evans") and Defendant James Hepworth ("Hepworth") were previously husband and wife.  Evans and Hepworth were divorced by Judgment entered October 29, 2015, in Ada County Case No. CV DW 2015-05437 (the "Divorce Judgment").  Evans and Hepworth had been married for eighteen years and had two minor children at the time of the Divorce Judgment.  Evans now has sole legal and physical custody of the children and has not remarried.

19.     During their marriage, Evans and Hepworth purchased 20,000 C Ordinary Shares (C Purchase Shares) and 20,424 D Purchase Shares in an entity known as "Redtop Holdings Limited."

20.     The Divorce Judgment specifically awarded Hepworth one-half (1/2) of the C Ordinary Shares (C Purchase Shares) and one-half (1/2) of the D Purchase Shares, with Evans being awarded the other half of the C Ordinary Shares (C Purchase Shares) and the D Purchase Shares.  (These C Ordinary Shares and the D Purchase Shares are sometimes referred to herein as the "Redtop Shares".)

21.     The Divorce Judgment specifically incorporated an "Agreement Regarding C and D Purchase Shares of Redtop Holdings Limited Company" (the "Agreement") between Evans and Hepworth regarding the eventual liquidation of the C and D Purchase Shares.

22.     A true and correct copy of this Agreement is attached hereto as *Exhibit 1*.

23.     Among other things, the Agreement provided as follows:

   a)  Paragraph 1 of the Agreement states that "…James shall continue to hold in trust for Amy's benefit her one-half (1/2) of the C Ordinary Shares and her one-half (1/2) of the D Purchase Shares awarded to her."

   b)  Paragraph 3 of the Agreement states that Hepworth was to give Evans notice of any sale of the shares and provide all necessary information in that regard.

   c)  Paragraph 3 also states that "…James acknowledges and agrees that, by executing this Agreement, he is conveying to Amy absolute ownership in 10,000 C Ordinary Shares (C Purchase Shares) and 10,212 D Purchase Shares awarded to Amy herein…"

   d)  Paragraph 4 states that "James will promptly notify Amy in writing of the occurrence of any event or receipt of any notification concerning the shares, terms and expiration of the shares."

   e)  Paragraph 7 states that "The parties agree to work with each other to insure that each of them continue to share in one-half (1/2) of the proceeds of this asset."

24.     Prior to November 1, 2017, Hepworth communicated with Redtop Holdings Limited regarding the potential liquidation of the Redtop Shares.  None of this communication was shared with Evans.

25.     On or about November 1, 2017, Hepworth received an Individual Allocation Letter from Redtop Holdings Limited, detailing the liquidation and payout of the Redtop Shares.

26.     A true and correct copy of this Individual Allocation Letter is attached hereto as *Exhibit 2*.

27.    Based on the Individual Allocation Letter, Hepworth was to receive One Million Three Hundred Fifty-Six Thousand, Four Hundred Forty-Eight pounds and eighteen pence (£1,356,448.18) (the "Initial payment").   An additional Fifty-one Thousand, One Hundred Twenty-Eight pounds and ninety pence (£51,128.90) was held in escrow and paid at a later date (the "Escrow payment").

28.    Hepworth directed that the Initial payment be made to a Keybank account owned by Defendant Swarthep, LLC.

29.    Swarthep, LLC, was formed in the state of Wyoming on October 31, 2017, just one day prior to the Individual Allocation Letter dated November 1, 2017, in which Hepworth directed the funds be deposited into the newly-formed LLC's Keybank account.

30.    Upon information and belief, "Swarthep" is a combination of _Hep_worth and _Swart_hout (the last name of Hepworth's girlfriend/fiancé and co-Defendant, Michela Swarthout).

31.    Rather than deposit the funds into a Swarthep account, Redtop Holdings deposited the Initial payment via wire transfer from "George CPA Management" to a Keybank account held by James Hepworth individually (the "Keybank 5342 account").

32.    After currency conversion, the Initial payment was One Million, Seven Hundred Ninety-five Thousand, Six Hundred Sixty-six dollars and ten cents ($1,795,666.10), which was deposited in the Keybank 5342 account on November 3, 2017.

33.    Notwithstanding the previous court judgment, the existence of the Individual Allocation Letter and the deposit of nearly $1.8 million dollars into his individual account, Hepworth failed to notify Evans of the existence or details of this transaction.

34.    Instead, Hepworth, in concert with Swarthout and a myriad of other companies (most of which were newly-formed LLC's created by Hepworth and/or Swarthout within 12

months of the Initial payment from Redtop Holdings), began a pattern of deception, transfers and spending in order to hide his receipt and use of the Redtop Holdings proceeds.

35.     Nearly all of the deception, transfers and spending were done with the knowledge, advice and assistance of Defendant Cloud Peak, which advertises itself as a law firm specializing in hiding assets from "creditors, bad luck, poor decisions, bankruptcy and divorce."  Further, Cloud Peak acts as registered agent for many of the remaining entity Defendants.

36.     Evans did not become aware of the details surrounding the Initial payment until April 2019.  By that time, Hepworth and the remaining Defendants had nearly exhausted the Redtop Holdings proceeds through a myriad of transfers and other lavish spending.

## Transfers from Swarthep, LLC

37.     After receiving the wire transfer on November 3, 2017, Hepworth nearly immediately transferred the entire balance to Swarthep.

38.     On November 7, 2017, Hepworth transferred the entire balance ($1,795,666.10) to a Keybank account owned by Swarthep (the "Keybank 4924 account").

39.     Shortly thereafter, either Hepworth or Swarthout caused Swarthep to further transfer the funds as follows:

    a)  On November 28, 2017, Swarthep transferred Six Hundred and Five Thousand dollars ($605,000.00) to a different Keybank account owned by HZ Global, LLC. The next day (November 29, 2017), HZ Global transferred $600,000.00 to another Keybank account with an unknown owner.

b)  On December 14, 2017, Swarthep transferred $215,000.00 via check to Idaho Luxe (this check was deposited into an Idaho Luxe bank account at Idaho Trust Bank – "ITB 8924 account").

c)  On December 28, 2017, Swarthep transferred $50,000.00 via check to "Wheels Up Partners LLC".

d)  On December 29, 2017, Swarthep transferred $25,000.00 via check to Swarthout personally.

e)  On December 29, 2017, Swarthep transferred $85,000.00 via check to Idaho Luxe (this check was also deposited into the ITB 8924 account).

f)  On January 24, 2018, Swarthep transferred $5000.00 to Hepworth's Keybank account.

g)  On March 8, 2018, Swarthep transferred $40,000.00 via check to Swarthout personally (this check was deposited into a Swarthout bank account at Idaho Trust Bank – "ITB 5586 account").

h)  On April 10, 2018, Swarthep transferred $5,000.00 via check to "Water Ski Pro Shop."  Upon information and belief, Swarthep has never owned a boat, but this payment was connected to Hepworth's individual purchase of a boat from the Water Ski Pro Shop for approximately $81,000.00.

i)  On May 4, 2018, Swarthep transferred $120,000.00 via check to TV Powder Coating (this check was deposited into a TV Powder Coating bank account at Idaho Trust Bank – "ITB 9245 account").

j)  On August 13, 2018, Swarthep transferred $50,000.00 via wire transfer to "Gambrel Auto Group."  Upon information and belief, Swarthep did not owe any

obligation to Gambrel Auto Group and did not receive anything from Gambrel Auto Group in return for the transfer of $50,000.00.

k)  On September 14, 2018, Swarthep transferred $15,000.00 to Hepworth's Keybank account.

l)  On October 3, 2018, Swarthep transferred $110,000.00 via wire transfer to "Pacific Pro Football."  Upon information and belief, Swarthep did not owe any obligation to Pacific Pro Football and did not receive anything from Pacific Pro Football in return for the transfer of $110,000.00.

m)  On October 27, 2018, Swarthep transferred $25,000.00 via check to Wanthub.

40.     Additionally, between December 2017 and May, 2019, Swarthep transferred approximately $157,988.80 to Citicard.

41.     Upon information and belief, Swarthep did not own or have any obligation to pay a Citicard or account.  Rather, the Swarthep payments to Citicard benefited one or more of the Defendants.


**Transfers from Luxe Imports for automobiles**

42.     Idaho Luxe is ostensibly in the business of owning luxury automobiles and leasing them for short periods of time to individuals with memberships.

43.     At all times relevant herein, Idaho Luxe maintained two bank accounts at Idaho Trust Bank, referred to herein as the ITB 8940 account and ITB 8924 account.

44.     Idaho Luxe would frequently transfer funds between its ITB accounts. Additionally, deposits into the accounts were made to either of the ITB accounts without any significant reasoning behind which account was used.

VERIFIED COMPLAINT & DEMAND FOR JURY TRIAL – PAGE 9
A♦J; Matter: 13405-002

45.     As outlined above, Idaho Luxe received $300,000.00 directly from Swarthep through deposit of $215,000.00 and $85,000.00 checks.

46.     In addition, Idaho Luxe deposited an additional $225,000.00 from unknown sources.

47.     Idaho Luxe also received funds from Swarthout in the amount of at least $87,331.83.

48.     Further, the Escrow payment (i.e., the remaining amount owed from the sale of the Redtop Holdings interest) was deposited directly into the Idaho Luxe ITB 8940 account. Consistent with the Individual Allocation Letter, this deposit was in the amount of $66,488.06, and was deposited into the ITB 8940 account on November 5, 2018.

49.     Again, Hepworth failed to inform Evans of the receipt or use of the Escrow payment.

50.     Idaho Luxe also received transfers in the amount of $74,000.00 and $1,000.00 from TV Powder Coating on October 9, 2018 and November 23, 2018.  TV Powder Coating had previously received these funds from Swarthep.

51.     Idaho Luxe received a transfer in the amount of $39,129.00 from McWorth Properties on November 26, 2018.  McWorth Properties had previously received these funds from TV Powder Coating via transfer on June 28, 2018.  TV Powder Coating had previously received the funds from Swarthep in May 2018.

52.     In all then, either directly or indirectly through Swarthout or others, Swarthep transferred over nearly $568,000.00 to Idaho Luxe.

53.     Idaho Luxe appears to have used the funds to purchase several expensive and exotic vehicles.

54.     For instance, Idaho Luxe paid a total of $249,388.00 to Uniek Motorsports.  In return, Uniek Motorsports sold Idaho Luxe a 2006 Lamborghini Gollardo Spyder, a 2012 McLaren MP4-12C, a 1957 Porsche Speedster, and a 1964 Ferrari 250 GOT kit car.

55.     Additionally, Idaho Luxe paid a total of $152,500.00 to Lupo Motors.  In return, Lupo Motors sold Idaho Luxe a 1976 Land Rover, a Ferrari, and a Mercedes C63.

56.     All of these cars were in addition to the wire transfer from Swarthep to "Gambrel Auto Group" in August 2018, which also paid for an automobile.

57.     Despite Idaho Luxe and Swarthep's payments for these automobiles, it appears none of the automobiles are titled in either Swarthep or Idaho Luxe's names, and therefore would not be considered assets of Swarthep or Idaho Luxe.

58.     Upon information and belief, Montana Luxe holds title for all of the vehicles paid for by Idaho Luxe and/or Swarthep.

59.     Additionally, other than an initial deposit of $20,000.00 labeled "lease payments", it does not appear Idaho Luxe ever received any lease or other membership income related to the use of the automobiles.

### Other Transfers

60.     As outlined above, Swarthep transferred $120,000.00 to TV Powder Coating on May 4, 2018.

61.     TV Powder Coating later transferred $45,000.00 to McWorth Properties on June 28, 2018.  McWorth Properties then transferred $39,129.00 of that amount to Idaho Luxe.

62.     TV Powder Coating later transferred the remaining $75,000.00 to Luxe on October 9, 2018 and November 23, 2018.

63.     In late 2018, Luxe transferred funds to Swarthout and McWorth Properties.  On November 26, 2018, Idaho Luxe transferred $66,000.00 to Swarthout.  On December 7, 2018, Idaho Luxe transferred $20,000.00 to McWorth Properties.

64.     Both Idaho Luxe and McWorth Properties paid funds to "Shenzhen KKMark Performance Equipment Co".

65.     Shenzhen KKMark Performance Equipment Co. Ltd., is a Chinese company specializing in manufacture and supply of trust systems, portable stage, flight and road cases, pipe and drape systems and clamp and coupler accessories.

66.     Upon information and belief, neither Idaho Luxe or McWorth Properties have a use for any products manufactured or supplied by Shenzhen KKMark Performance Equipment Co. Ltd.  Rather, any items provided by that company were for the benefit of companies other than Idaho Luxe and McWorth Properties.

## Last-Minute 2019 transfers

67.      In April 2019, Evans learned of Hepworth's receipt of the Redtop Holdings proceeds and began investigating what Hepworth had done with the proceeds.  On April 11, 2019, she filed a Petition to Enforce Judgment of Divorce in the Ada County divorce proceeding. A copy of that petition was served on Hepworth.

68.     Almost immediately thereafter, Hepworth and Swarthout fled the state of Idaho and continue to live at an undisclosed location outside the state as of the date of this Complaint. Additionally, they began consolidating the remaining funds held in the various business accounts.

69.     For instance, in June 2019, Luxe transferred all remaining cash holdings as follows:

    a)  On June 10, 2019, Idaho Luxe transferred $60,000.00 to McWorth's ITB 9310 account.

    b)  On June 11, 2019, Idaho Luxe transferred $20,000.00 to McWorth's ITB 9310 account.

    c)  On June 21, 2019, Idaho Luxe transferred $19,000.00 to McWorth's ITB 9310 account.

    d)  On June 21, 2019, Idaho Luxe transferred $29,000.00 to McWorth's ITB 9310 account.

70.     After receiving funds from Idaho Luxe, McWorth further transferred the funds. Upon information and belief, McWorth opened a new bank account at First Northern Bank of Wyoming (the FNBW 4404 account). On June 24, 2019, McWorth moved the bulk of the funds from the ITB account ($132,000.00) to the FNBW 4404 account.

71.     On July 15, 2019, Michela also liquidated her ITB account, transferring $55,000.00 to a new account.  Upon information and belief, this new account was also at First Northern Bank of Wyoming.

### **Damages caused by Hepworth and Swarthout's enterprise**

72.     After learning of Hepworth and Swarthout's deception and attempts to transfer and hide assets, Evans returned to the Ada County divorce court and obtained a money judgment against Hepworth for the amount of the Redtop Holdings liquidation to which she was entitled.

73.     While it appears Evans will recover some value from Hepworth's individual bank accounts, a large portion of the judgment (in excess of $300,000.00) remains unpaid with no real likelihood of collecting from Hepworth individually as his individual assets will be exhausted.

74.     Evans damages are a direct and proximate result of Hepworth, Swarthout, and the other Defendants' actions.

75.     From the creation of Swarthep in 2017 through and including, without limitation, the use of follow-on entities like Idaho Luxe, Montana Luxe, TV Powder Coating, Yuancela, McWorth Properties, Hepworth and Swarthout's actions have improperly and unlawfully enriched Hepworth, Swarthout and the other Defendants.

76.     Hepworth, Swarthout and the remaining Defendants have been unjustly enriched by their fraudulent actions, including the commercial transactions discussed above.

77.     Evans is entitled to restitution and disgorgement from Hepworth, Swarthout and the remaining Defendants in an amount equal to, at least, the amounts the Defendants received (or value of the assets the Defendants received) in connection with the scheme described above – including any gains from each of the entitled so involved.

78.     Defendants Hepworth, Swarthout, Swarthep, HZ Global, Idaho Luxe, Montana Luxe, TV Powder Coating, McWorth Properties, Yuancela and Cloud Peak are sometimes referred to herein as the "Conspiracy Defendants" or "Enterprise Defendants."

### COUNT I – VIOLATION OF THE UNIFORM VOIDABLE TRANSACTION ACT
*As to all Defendants*

79.     Evans incorporates by reference the foregoing paragraphs as if fully set forth herein.

80.     At all relevant times, Evans was a creditor of Hepworth.

VERIFIED COMPLAINT & DEMAND FOR JURY TRIAL – PAGE 14
A♦J; Matter: 13405-002

81.     At all relevant times, Evans was entitled to one-half of the proceeds from the sale of the Redtop Holdings interest.

82.     The Defendants received unlawfully transferred assets, including funds to which Evans was entitled, and/or assets purchased with those funds (including the automobiles described above).

83.     The transfers described above were all made with the actual intent to hinder, delay, or defraud Evans.

84.     For example:

   a)   Immediately after receiving the funds from Redtop Holdings, Hepworth directed that they be transferred to Swarthep.   Swarthep then began immediately transferring the funds to other entities, including Idaho Luxe.

   b)   Idaho Luxe immediately (or almost immediately) used the funds to purchase several exotic automobiles.

   c)   Despite Idaho Luxe's purchase of the automobiles, none of them are titled or registered in Idaho Luxe's name.   Rather, the automobiles are titled in the name of other entities.

   d)   Immediately upon Evans' discovery of the transfer scheme, Hepworth and Swarthout move all funds from Swarthout and/or Luxe and transfer them to McWorth Properties (and, potentially, even to other currently unknown entities).

85.     The transfers were made without Evans, Hepworth, Swarthep or the other Defendants receiving reasonably equivalent value in exchange and when Hepworth was insolvent or had become insolvent as a result of the transfers.

86.     Accordingly, the transfers are avoidable fraudulent transfers pursuant to Idaho Code Sections 55-913(1)(a)-(b) and 55-914(1), and the amounts and any interest transferred to these Defendants must be disgorged.

## COUNT II – CONVERSION
### As to all Defendants

87.     Evans incorporates by reference the foregoing paragraphs as if fully set forth herein.

88.     Through the unlawful transfers described above, the Defendants improperly received substantial sums, at least some portion of which rightfully belonged to Evans.  These gains by the Defendants were at Evans direct expense.

89.     Until the time the Defendants wrongfully came into possession of said sums of money, Evans was the rightful owner of at least one-half of the sums and was entitled to immediate possession of that one-half sum.

90.     By receipt of the transferred funds the assets, Defendants converted said sums to their own use and retained them despite Evans clear ownership of one-half of the sums.

91.     Defendants wrongful conversion of the assets caused Evans damages exceeding $300,000.00, exclusive of interest and costs.

## COUNT III – CONSPIRACY
### As to all Defendants except Wanthub, Inc.

92.     Evans incorporates by reference the foregoing paragraphs as if fully set forth herein.

93.     The Conspiracy Defendants conspired and entered into agreements with each other, and others known and unknown, to commit unfair and deceptive acts, to convert Evans monies, to breach Hepworth's contract with Evans, and to otherwise transfer and hide assets so as to prevent Hepworth's payment to Evans.

94.     The Conspiracy Defendants took overt actions in furtherance of the conspiracy, including by setting up the fraudulent transfers, by transferring property and/or funds between one another, by failing to charge any fees or lease payments for use of the vehicles purchased with the improperly received funds, and by taking steps to hide the transfers and improper use of assets.

95.     The Conspiracy Defendants' actions proximately caused Evans damages exceeding $300,000.00.

### COUNT IV – VIOLATIONS OF THE U.S. RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO")
#### *As to all Defendants except Wanthub, Inc.*

96.     Evans incorporates by reference the foregoing paragraphs as if fully set forth herein.

97.     The Enterprise Defendants are each a person within the meaning of RICO and 18 U.S.C. §1961.

#### *A. Pattern of Racketeering Activity*

98.     The following acts of racketeering began by at least 2017 and continued through the filing of this Complaint, and form a pattern of continuous and interrelated racketeering activity within the meaning of RICO and section 1961.

99.     The Enterprise Defendants transported, transmitted or transferred in interstate commerce securities or money of the value of $5,000 or more, knowing the same to have been converted or taken by fraud and through the Enterprise Defendants scheme against Evans, when the funds were transferred to other Defendants or used to purchase assets which were then transferred to other Defendants as detailed above, repeatedly between November 2017 and the present.  Said actions were taken either by wire transfer, transfer between existing bank accounts, mailing funds via mail or other courier service across state lines, or by delivering in person cash or cash equivalents with a value of $5,000 or more – including each of the instances detailed above.  Each such instance violated 18 U.S.C. §2314.

100.    With the Enterprise Defendants having devised a scheme or artifice to defraud Evans and deprive her of her rightful funds, and to obtain money or other assets by means of said scheme or artifice as detailed in this Complaint, each such instance of transfer of funds or assets involving U.S. Mail or other courier service was for the purpose of executing such scheme or artifice or attempting to do so in violation of 18 U.S.C. §1341.  Each of the instances described herein violated 18 U.S.C. §1341.

101.    With the Enterprise Defendants having devised a scheme or artifice to defraud Evans and to obtain money or assets by means of the scheme or artifice as detailed in this Complaint, the Enterprise Defendants did transmit and cause multiple agents to transmit by means of wire in interstate commerce writing or emails for the purpose of executing such scheme or artifice or attempting to do so, in violation of 18 U.S.C. §1343.  Each such instance violated 18 U.S.C. §1343.

### B. Violations of 18 U.S.C. §1962(a)

102.    The Enterprise Defendants each received income and/or proceeds derived, directly and/or indirectly, from the pattern of racketeering activity and resulting growth of their entities' business assets as detailed above.

103.    From 2017 through the present, the Enterprise Defendants each used and/or invested, directly and/or indirectly, part of such income or proceeds thereof in acquiring an interest in, establishing, and operating each of the following entities: Swarthep, HZ Global, Idaho Luxe, Montana Luxe, TV Powder Coating, McWorth Properties and Yuancela.

104.    Each of these entities engaged and/or engages in interstate commerce, and/or their activities affected and affect interstate commerce, and each operated as an enterprise within the meaning of RICO.

105.    The Enterprise Defendants' actions violated 18 U.S.C. §§ 1962(a) and 1964.

106.    The Enterprise Defendants' actions injured Evans in the ways described in this Complaint and proximately caused Evans damages exceeding $300,000.00, exclusive of interest and costs.

### C. Violations of 18 U.S.C. §1962(c)

107.    Starting in November 2017, and continuing to the present, Hepworth and Swarthout each conducted and participated, directly or indirectly, in the conduct of the Swarthep, HZ Global, Idaho Luxe, Montana Luxe, TV Powder Coating, McWorth Properties and Yuancela (the "Enterprise Group").

108.    The Enterprise Group, operated and managed by Hepworth and Swarthout, engaged in interstate commerce, and their activities affected interstate commerce as detailed at

length in the preceding paragraphs, and it operated as an association-in-fact enterprise within the meaning of RICO.

109.    The Enterprise Defendants' actions violated 18 U.S.C. §§ 1962(c) and 1964.

110.    The Enterprise Defendants' actions injured Evans in the ways described in this Complaint and proximately caused Evans damages exceeding $300,000.00, exclusive of interest and costs.

### D. Violations of 18 U.S.C. §1962(d)

111.    The Enterprise Defendants conspired with each other and others known and unknown to violate 18 U.S.C. §1962 as detailed at length above and took acts in furtherance thereof.

112.    The Enterprise Defendants' conduct violated 18 U.S.C. §§ 1962(d) and 1964.

113.    The Enterprise Defendants' actions injured Evans in the ways described in this Complaint and proximately caused Evans damages exceeding $300,000.00, exclusive of interest and costs.

### COUNT V – VIOLATION OF THE IDAHO RACKETEERING ACT
#### As to all Defendants except Wanthub, Inc.

114.    Evans incorporates by reference the foregoing paragraphs as if fully set forth herein.

115.    The Idaho Racketeering Act prohibits the following activities:

(a)  It is unlawful for any person who has received any proceeds derived directly or indirectly from a pattern of racketeering activity in which the person has participated, to use or invest, directly or indirectly, any part of the proceeds or the proceeds derived from the investment or use thereof in the acquisition of any

VERIFIED COMPLAINT & DEMAND FOR JURY TRIAL – PAGE 20
A♦J; Matter: 13405-002

interest in, or the establishment or operation of, any enterprise or real property. Whoever violates this subsection is guilty of a felony.

(b)  It is unlawful for any person to engage in a pattern of racketeering activity in order to acquire or maintain, directly or indirectly, any interest in or control of any enterprise or real property. Whoever violates this subsection is guilty of a felony.

I.C. § 18-7804 (a), (b).

116.    A "pattern of racketeering activity" means:

engaging in at least two (2) incidents of racketeering conduct that have the same or similar intents, results, accomplices, victims or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated incidents, provided at least one (1) of such incidents occurred after the effective date of this act and that the last of such incidents occurred within five (5) years after a prior incident of racketeering conduct.

I.C. § 18-7805 (d).

117.    "Incidents of racketeering conduct" include: engaging in (i) fraudulent practices, and fraud generally; (ii) securities fraud; (iii) theft and related crimes; and (iv) unlawful corporate misconduct. *See* I.C. § 18-7803 (2), (10), (13), (16)

118.    Under the Idaho Racketeering Act, "[a] person who sustains injury to his person, business or property by a pattern of racketeering activity may file an action in the district court for the recovery of three (3) times the actual damages proved and the cost of the suit, including reasonable attorney's fees." I.C. § 18-7805(a).

119.    As described herein, the Enterprise Defendants engaged in numerous incidents of racketeering ("Incidents of Racketeering"), which are continuous and related behavior that amount to, or pose a threat of, continued criminal violations.

120.    As a direct result of the Enterprise Defendants' pattern of racketeering activity, Evans has sustained damages in excess of $300,000.00.

121.    As a result of the Enterprise Defendants' conduct, Evans is entitled to recover three (3) times the actual damages proved as set forth in I.C. § 18-7805, plus interest, costs, and attorney fees.  I.C. § 18-7805(a).

## REQUEST FOR ATTORNEYS' FEES

122.    Evans has been required to retain the services of counsel to prosecute this matter on her behalf, and is entitled to reasonable attorneys' fees for prosecution of this action, pursuant to applicable law, including, but not limited to, Idaho Code §§ 12-120(3) and 12-121, and Rule 54 of the Idaho Rules of Civil Procedure, in such sums as the Court may deem just and equitable.

## PUNITIVE DAMAGES

123.    Under I.C. § 6-1604, a claim for punitive damages requires proof, by clear and convincing evidence, that the Defendants engaged in oppressive, fraudulent, malicious, and/or outrageous conduct.  A Plaintiff, however, may not seek punitive damages at the outset, but may, after a motion and hearing before the Court, amend the pleadings to include a claim for punitive damages.  Evans hereby reserves her right to amend their pleadings to include a claim for punitive damages after further investigation and discovery if the facts and circumstances warrant such a claim.

## DEMAND FOR JURY TRIAL

Evans hereby demands a trial by jury.

## **VERIFICATION**

STATE OF IDAHO        )
                                 ) ss.
County of Ada              )

       Amy Evans, being first duly sworn on oath, deposes and says: That she is the Plaintiff in the above entitled action; that she has read the above and foregoing and knows the contents thereof; and that the facts stated therein are true as she verily believes.

       DATED this 1st day of October, 2019.


_____
Amy Evans


SUBSCRIBED AND SWORN to before me this 1st day of October, 2019.


_____
Notary Public
Commission Expires: __10/29/21__

**VERIFIED COMPLAINT & DEMAND FOR JURY TRIAL – PAGE 23**
A✦J; Matter: 13405-002

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Amy Evans respectfully requests, with respect to all Claims stated above, that the Court enter judgment in her favor and against the Defendants and award the following relief:

(a) Damages flowing from the improper receipt by Wanthub, Inc., of funds to which Evans was entitled, in the amount of $150,000.00;

(b) Damages flowing from the failure to pay Evans the amounts she was rightfully entitled to under the Agreement, in the amount of at least $300,000.00;

(c) Damages in the form of restitution or disgorgement by the Enterprise Defendants, removing from the Enterprise Defendants the gains or profits the Enterprise Defendants unjustly and improperly received as a result of the arrangement and scheme described in this Complaint;

(d) Damages in the form of the value of any consideration provided by the Enterprise Defendants to any person in connection with the arrangement and scheme described in this Complaint;

(e) Treble damages and attorney's fees, including under RICO and the Idaho Racketeering Act;

(f) Punitive damages;

(g) Pre- and post-judgment interest;

(h) Evans' costs and fees (including attorneys fees) incurred in bringing this action.  In the event of entry by default without appearance by the Defendants, reasonable attorneys fees shall be $10,000.00.  In the event of entry by default after appearance by the Defendants, reasonable attorneys fees shall be determined by the Court; and

(i) Other such relief as the Court deems just and proper.

DATED this 1st day of October, 2019.

/s/ Matt Christensen
MATTHEW T. CHRISTENSEN
Attorney for Plaintiff Amy Evans

Exhibit 1

## AGREEMENT REGARDING
## C AND D PURCHASE SHARES OF REDTOP HOLDINGS LIMITED
## COMPANY

1.     Pursuant to paragraph 5u of the Judgment entered in Ada County Case No. CV

DW 15-05437, Amy Hepworth v. James Hepworth, Amy and James are each awarded one-half

(1/2) of the 20,000 C Ordinary Shares (C Purchase Shares) and one-half (1/2) of the 20,424 D

Purchase Shares of Redtop Holdings Limited ("The Company") and each is responsible for one-

half of the loan to acquire said Shares (C and D) pursuant to the Share Purchase and Loan

Agreement entered March 10, 2015. The legal title to the C Ordinary Shares and D Purchase

Shares is currently held in trust by George CPA Management Nominee Limited as Nominee for

James Hepworth. As between James and Amy, James shall continue to hold in trust for Amy's

benefit her one-half (1/2) of the C Ordinary Shares and her one-half (1/2) of the D Purchase

Shares awarded to her.

2.     Amy shall pay and agrees to indemnify James from all taxes (income, transfer,

capital gains) and all fees and costs on the shares awarded to her. The payment of taxes, fees and

costs shall be made either directly by Amy, if allowed by law, or by reimbursement to James for

the taxes, fees and costs, payable by him, with the taxes determined at James's highest marginal

tax rate, if James is taxed on Amy's shares. If possible, James agrees to cause to be delivered to

Amy the shares of stock she owns.

3.     James shall give Amy notice of any sale of the C Ordinary Shares and D Purchase

Shares or any offer to purchase the C Ordinary Shares and D Purchase Shares and provide all

necessary information to Amy in that regard. In the event that the Shares are increased after the

execution hereof by stock splits, warrants or other action taken by the corporation, all such stock

AGREEMENT REGARDING C AND D PURCHASE SHARES OF REDTOP HOLDINGS
LIMITED COMPANY – Page 1

splits, warrants, or the like attributable to that portion of the stock rights (shares) conveyed to Amy hereunder shall inure to the benefit of Amy. Because such share rights cannot be transferred to Amy, James agrees to at such time as Amy elects that he shall comply with her requests regarding sale or the shares and James acknowledges and agrees that, by executing this Agreement, he is conveying to Amy absolute ownership in 10,000 C Ordinary Shares (C Purchase Shares) and 10,212 D Purchase Shares awarded to Amy herein, subject to the terms of the Share Purchase and Loan Agreement.

4.      James will promptly notify Amy in writing of the occurrence of any event or receipt of any notification concerning the shares, terms and expiration of the shares or his employment.

5.      Amy may not take any action with regard to the shares which James is prohibited from doing under the Share Purchase and Loan Agreement or by Law.

6.      Should James be terminated for cause from his employment with Redtop Holding Limited, he shall make every attempt to minimize the amount owed on the loan to acquire the shares referenced herein. If James leaves his employment voluntarily he shall make every attempt to minimize the amount owed on the loan to acquire the shares referenced herein.

7.      The parties understand and agree that the C Ordinary Shares and D Purchase Shares are in a company in the United Kingdom and that the intent is that the parties shall share in one-half (½) of the C Ordinary Shares and D Purchase Shares or the net proceeds therefrom to the extent the shares cannot be transferred into Amy's name. The parties agree to work with each other to insure that each of them continue to share in one-half (1/2) of the proceeds of this asset.

AGREEMENT REGARDING C AND D PURCHASE SHARES OF REDTOP HOLDINGS LIMITED COMPANY – Page 2

Dated this __9__ day of __October__, 2015.

_____
James Hepworth

STATE OF IDAHO          )
                                       SS.
COUNTY OF ADA          )

On this __9rd__ day of __October__, 2015, before me, a Notary Public of the State of Idaho, personally appeared, JAMES HEPWORTH, known or identified to me to be the person whose name is subscribed to the within instrument, and acknowledged to me that she signed the

_____
Notary Public for Idaho
Residing at __Meridian__, Idaho
Commission Expires __6-4-2019__

Dated this __20th__ day of __October__, 2015.

_____
Amy Hepworth

STATE OF IDAHO          )
                                       SS.
COUNTY OF ADA          )

On this __20th__ day of __October__, 2015, before me, a Notary Public of the State of Idaho, personally appeared, AMY HEPWORTH, known or identified to me to be the person whose name is subscribed to the within instrument, and acknowledged to me that she signed the same.

_____
Notary Public for Idaho
Residing at __Boise__, Idaho
Commission Expires __8/26/2021__

AGREEMENT REGARDING C AND D PURCHASE SHARES OF REDTOP HOLDINGS LIMITED COMPANY – Page 3

Exhibit 2

## INDIVIDUAL ALLOCATION LETTER

To:

James Hepworth (**"Manager"**)
216 W Ivywild St
Boise
ID 83706
USA

From:

Redtop Holdings Limited (**"Company"**)
11-15 Seaton Place
St Helier
Jersey
JE4 0QH

1 November 2017

By email: jhepworth@cpaglobal.com

Dear James Hepworth

1.      This letter is entered into pursuant to:

1.1     a sale and purchase agreement dated 27 August 2017 between (1) the Institutional Sellers (as defined therein) (2) Intertrust Trustee 2 (Guernsey) Limited (3) George CPA Management Nominee Limited (**"Management Nomco"**) (4) the Company (5) Cinven Limited (6) Simon Webster and (7) Capri Acquisitions Bidco Limited (**"Purchaser"**) (**"SPA"**) relating to the sale of the entire issued share capital of the Company (**"Transaction"**); and

1.2     a warranty deed dated 27 August 2017 between (1) the Warrantors (as defined therein and being certain management shareholders of the Company) and (2) the Purchaser (**"Warranty Deed"**) relating to certain warranties given by the Warrantors to the Purchaser in connection with the Transaction;

2.      Definitions used in this letter shall have the same meaning as in the SPA unless otherwise defined herein. References to clauses are references to clauses in the SPA.

3.      The Manager hereby warrants that he is the beneficial holder as at the date of this letter of the following Shares in the Company (the **"Manager Securities"**):

| Class of Shares | Number of Shares |
|---|---|
| C Ordinary Shares | 20,000 |
| D Shares | 20,424 |

4.      The Manager acknowledges and agrees that there is an outstanding loan due from the Manager to the Company in the amount of £40,424.00 (**"Loan"**).

SW/SEL/325415/29/UKM/85486512.1

5.   The Manager hereby undertakes to the Company that he will account for all Tax due to the relevant Tax Authority pursuant to the transfer of the Manager Securities to the Purchaser within the time limits prescribed by law and that to the extent that he fails to so account and that any Tax Authority seeks to recover such tax from any member of the Group or the Purchaser, he shall pay to such person the amount for which they are required to account to the relevant Tax Authority.

6.   The Company and the Manager hereby acknowledge and agree that for the purposes of clauses 2.2 and 2.4 of the SPA, the Manager's entitlement to the Price shall be £1,448,001.09 (the "**Entitlement**"), which the Manager agrees and directs shall be paid, at Closing:

6.1   as to £40,424.00 to be paid to the Company on behalf of the Manager in full and final satisfaction of the Loan;

6.2   as to £51,128.90 (the "**Escrow Amount**") into the escrow account held with Intertrust (Netherlands) B.V. in accordance with the Contribution Arrangement (as defined below); and

6.3   as to £1,356,448.18 to be paid in cash on Closing into the account detailed in paragraph 11 below or such other account as may be notified to the Management Nomco.

7.   The Manager hereby acknowledges that:

7.1   pursuant to the terms of the Warranty Deed the Warrantors have given certain warranties to the Purchaser in connection with the Transaction ("**Warranties**");

7.2   it is proposed that any liability incurred by any of the Warrantors as a result of giving such Warranties (any such liability being the "**Warranty Claim Liability**") is to be borne by all individual beneficial holders of shares in the capital of the Company (together with the Warrantors being the "**Management Shareholders**") pro-rata to their respective Entitlement; and

7.3   it is proposed that the maximum liability of each Management Shareholder (being the Escrow Amount for the Manager) pursuant to such arrangement will be held in the Escrow Account on their behalf for a period of 12 months from Closing to settle any Warranty Claim Liability which arises (if any), with such sum being paid to each Management Shareholder (less any amount used to settle any Warranty Liability Claim) at the expiry of such 12 month period,

   (being the "**Contribution Arrangement**").

8.   The Manager hereby agrees in connection with the Contribution Arrangement that his:

8.1   relevant proportion of any Warranty Claim Liability is no more than 1.00% of such liability; and

8.2   aggregate liability cap in respect of all demands and claims pursuant to the terms of the Contribution Arrangement is an amount equal to the Escrow Amount, which is to be settled entirely from the Escrow Account in the event of a claim pursuant to the terms of the Warranty Deed.

9.   In the event that no Warranty Claim Liability arises in the 12 month period from Closing, the entire Escrow Amount will be transferred to the Manager on the expiry of such period.

10.   Where relevant in this letter, reference to the Company shall be deemed to include reference to any Target Company. Further, the parties hereto acknowledge and agree that the

Management Nomco, given it is the legal holder of the Manager Securities, shall be entitled to enforce the terms of this deed as if it were a party hereto.

11.    For the purposes of paragraph 6.3 the relevant account for the purposes of payment of my Entitlement is:

| Bank: | Key Bank | Bank SWIFT: KEYBUS33 |
|---|---|---|
| Account Name: | Swarthep, LLC | EIN: ███7545 |
| Sort Code: | 124101555 | |
| Account Number: | ████5342 | ████4924 |
| Reference: | Capri / Cash Entitlement | |

12.    This deed and any non-contractual obligations arising out of or in connection with this deed shall be governed by, and interpreted in accordance with, English law. The English courts shall have exclusive jurisdiction in relation to all disputes (including claims for set-off and counterclaims) arising out of or in connection with this deed.

13.    This deed may be executed in any number of counterparts, and by each party on separate counterparts. Each counterpart is an original, but all counterparts shall together constitute one and the same instrument. Delivery of a counterpart of this letter by e-mail attachment shall be an effective mode of delivery.

14.    Please confirm your acknowledgement and agreement to the matters set out in this deed and the settlement of your Entitlement (as set out at paragraph 6 above) by arranging for the enclosed copy to signed, dated and returned to Simon Wright of DLA Piper UK LLP by email to simon.wright@dlapiper.com. On receipt thereof, the payments set out at paragraph 6 above will be authorised.

Yours sincerely

Simon Webster for and on behalf of **Redtop Holdings Limited**

*I have read and agree to the terms of this deed and confirm that my account details at paragraph 11 of the letter are correct:*

Executed as a deed, but not delivered until the first date specified at the start of this letter, by **James Hepworth** in the presence of a witness:

)
)
)
)

Signature _____

Witness signature _____

Witness name
(block capitals)         DWIGHT THURSTON

Witness address         4331. N. Anath Ave
                        Meridian ID, 83646